**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| ROBB W. BIEWENER, | ) No. ED CV 04-460-PLA |
| Plaintiff, | ) |
| | ) **MEMORANDUM OPINION AND ORDER** |
| v. | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY ADMINISTRATION, | ) |
| Defendants. | ) |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on April 16, 2004, seeking review of the Commissioner's denial of his applications for Disability Insurance and Supplemental Security Income benefits. The parties filed a Consent to proceed before the undersigned Magistrate Judge on June 2, 2004.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on April 4, 2005, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

1

## II.

2

## **BACKGROUND**

3        Plaintiff was born on August 29, 1956. [Administrative Record ("AR") at 419.] Plaintiff has

4   completed four years of college and has past relevant work experience as a plastics mold maker

5   and supervisor. [AR at 424, 429.]

6        On June 19, 2000, plaintiff filed applications for Disability Insurance Benefits and

7   Supplemental Security Income payments.[1]  [AR at 93-95, 287-88, 296.] Plaintiff alleged disability

8   due to severe depression, and claimed that he has been unable to work since August 3, 1995. [AR

9   at 93, 100, 287.] After his applications were denied initially and on reconsideration, plaintiff

10  requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on April 11,

11  2002, at which plaintiff appeared with counsel and testified on his own behalf. A vocational expert

12  and a lay witness also testified. [AR at 30-62.] On May 31, 2002, the ALJ determined that although

13  plaintiff had impairments that were severe, he was still able to perform his past relevant work as

14  a plastics mold maker. [AR at 17.] Thus, the ALJ concluded that plaintiff was not disabled. [AR at

15  13-18.]

16       Plaintiff requested review of the ALJ's decision on June 6, 2002. [AR at 9.] On July 19,

17  2002, the Appeals Council denied plaintiff's request and affirmed the ALJ's decision. [AR at 5-6.]

18  On September 5, 2002, plaintiff appealed the Council's decision to the District Court and, on June

19  5, 2003, the parties stipulated that the case be remanded to the Commissioner for further

20  proceedings, including a new hearing and decision. [AR at 532-34.] The Commissioner, through

21  an Order of the Appeals Council dated August 27, 2003, remanded the case to an ALJ. [AR at

22  536-38.] Pursuant to the Remand Order, a new hearing was held on November 25, 2003, at which

23  plaintiff appeared with counsel and testified on his own behalf. A vocational expert and a lay

24  witness also testified at the second hearing. [AR at 363-91.] On January 30, 2004, the ALJ

25  determined that although plaintiff was unable to perform any of his past relevant work, he still

26

27       [1]   Plaintiff previously filed an application for Disability Insurance benefits on August 19, 1998,
    which was denied on January 8, 1999. [AR at 68-71, 90-92.] Plaintiff took no further action on that
28  application, rendering the decision by the Social Security Administration final. [AR at 297.]

retained the residual functional capacity[2] to perform a significant number of jobs in the national economy. [AR at 296-304.] Thus, the ALJ concluded that plaintiff was not disabled.[3] [Id.]

### III.

### STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1040-1041 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

---

[2] Residual functional capacity ("RFC") is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[3] Plaintiff filed a new application for Supplemental Security Income benefits on June 25, 2002, for which a hearing was held on July 10, 2003. [AR at 326-60, 419-21.] Plaintiff appeared at this hearing with an attorney and testified on his own behalf. [AR at 326-27.] A lay witness also testified at the hearing. [Id.] Based on plaintiff's residual functional capacity, age, education, and work experience, the ALJ determined on September 22, 2003, that plaintiff was functionally capable of performing unskilled work and therefore was not disabled. [AR at 315-24.]

# IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy.  The determination of this issue comprises the fifth and final step in the

4

1  sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d

2  at 1257.

3

4  **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

5         In this case, at step one, the ALJ concluded that plaintiff has not engaged in any substantial

6  work activity since the alleged onset of his disability.  [AR at 302.]  At step two, the ALJ concluded

7  that plaintiff's depressive disorder, anxiety disorder, probable bipolar disorder, and history of drug

8  abuse were severe. [AR at 303.] At step three, the ALJ found that plaintiff's impairments do not

9  meet or equal the requirements of any of the impairments in the Listing. [<u>Id.</u>] The ALJ found that

10  plaintiff has the residual functional capacity to perform "simple repetitive tasks in jobs that do not

11  require hypervigilance; responsibility for the safety of others; any contact with the general public;

12  any intense interpersonal interactions; high production, quotas, or rapid assembly work; or having

13  to perform at a moderate or greater pace. " [<u>Id.</u>] At step four, the ALJ concluded that plaintiff is

14  unable to perform his past relevant work. [<u>Id.</u>] At step five, the ALJ concluded that based on

15  plaintiff's residual functional capacity, age, education, and work experience, there is a significant

16  number of jobs he can perform in the national economy. [<u>Id.</u>] Thus, the ALJ found plaintiff not

17  disabled. [<u>Id.</u>]

18

19                                           **V.**

20                               **THE ALJ'S DECISION**

21         Plaintiff contends that the ALJ (1) failed to appropriately consider the testimony and

22  statements of plaintiff's mother and father[4]; and (2) failed to properly comply with the Order of the

23  Appeals Council to give proper weight to the opinions of plaintiff's treating physicians. For the

24  reasons discussed below, the Court agrees with plaintiff, in part, and remands this case for further

25  proceedings.

26  _____

27         [4]    Although plaintiff refers in the statement of Disputed Issues and Issues and Contentions
    sections of the Joint Stipulation to the testimony of plaintiff's wife, it appears he in fact is
28  challenging the consideration of the statements of his mother and father.

1
**A.     THE EVIDENCE**

2
        As relevant to the issues raised in the Joint Stipulation, plaintiff, at the time of the hearing,

3
was 47 years old and had completed four years of college. [AR at 364-65, 429.] According to

4
plaintiff's Disability Report, dated June 27, 2000, plaintiff stopped working on August 3, 1995,

5
because of severe depression and mood swings and because he "could not sleep at night." [AR

6
at 112.] As of July 18, 2002, plaintiff claimed that he also suffered from anxiety attacks. [AR at

7
423.]  At the hearing on November 25, 2003, plaintiff testified that he was experiencing problems

8
with depression, possibly dating back to a couple of years before he stopped working. [AR at 370.]

9
Plaintiff also stated that he has problems with mood swings, such that he tends to get angry and

10
irritated quite easily. [AR at 367-69.] At his prior hearing on April 11, 2002, plaintiff testified that

11
he has trouble concentrating and finishing things, and cannot complete something as simple as

12
reading an entire newspaper article. [AR at 34.] When asked whether he tended to get frustrated

13
or irritable, plaintiff responded that while he used to have a lot of patience, he now "fl[ies] off the

14
handle . . . at the drop of a hat," which plaintiff said scares him. [AR at 34.] Additionally, plaintiff

15
stated that he does not deal with stress well, has trouble sleeping, and has problems dealing with

16
people. [AR at 35-36, 41.] As a result, plaintiff stated that he could not hold down a job and had

17
walked out on 7 or 8 of them. [AR at 38-40.]

18
        At the April 11, 2002, hearing, plaintiff stated that he had seen about 7 or 8 different

19
psychiatrists for treatment. [AR at 47.] While plaintiff testified that he was currently taking Serzone

20
to combat his depression and Tegretol for his mood swings, he indicated that he had changed his

21
medication several times. [AR at 35, 45.] When asked whether medication helped him, plaintiff

22
responded that it did help a little bit, but not to the point where it put him back to where he was

23
before. [AR at 44.] Plaintiff also testified that he had previously suffered from an alcohol and drug

24
problem, but that he had been clean since putting himself through drug rehabilitation in 1987. [AR

25
at 45-46.]

26
        Plaintiff's mother, Celia Ann Biewener, also testified at the hearing held on November 25,

27
2003. Ms. Biewener stated that plaintiff had been living with her and her husband on and off for

28
the past five years, and had continually lived there for the past three years. [AR at 372.] In addition

to taking care of plaintiff, Ms. Biewener stated that she also looks after her mother-in-law, which causes her to leave the house from time to time. [AR at 375.] Ms. Biewener stated that she probably sees her son every day, but not on those days when he secludes himself in his room and refuses to come out. [AR at 376.] While Ms. Biewener stated that plaintiff sometimes uses the computer, she also stated that he gets very frustrated with it, and she hears him "hollering and yelling and screaming" at it. [AR at 377.] When talking about plaintiff's outbursts, she testified that sometimes plaintiff will talk on and on and yell and scream and then, all of a sudden, just "abruptly stop and sit down and cry." [AR at 377.] When asked whether plaintiff has gotten any better since beginning therapy, Ms. Biewener replied that there are periods when she thinks plaintiff is improving, but that as soon as she starts to get encouraged, things start to change. [AR at 378.] Although she testified that she was unsure whether she would be able to recognize the signs of someone using drugs, Ms. Biewener stated that she hasn't seen any indication that plaintiff is using drugs presently. [AR at 379.] She also testified that she and her husband have been paying plaintiff's child support for the past five years. [AR at 378-79.]

Prior to testifying, on July 26, 2000, Ms. Biewener had filled out a third party questionnaire with her husband, Ron Biewener. [AR at 140-45.] In the questionnaire, the Bieweners described plaintiff's typical day as sleeping late, keeping to himself, watching television, and not communicating a great deal. [AR at 140, 145.] They also indicated that while plaintiff is able to groom himself, prepare his own food, and do some household chores, whether or not he does so depends on his mood. [AR at 141-42.] For instance, sometimes plaintiff will start a chore, but then become agitated and frustrated and just walk away. [AR at 144.] The Bieweners explained that at other times, plaintiff's cleanliness would become obsessive and he would have racing thoughts and get "grandios[e] ideas and stay up all night."  [AR at 141, 144.]

According to the Bieweners, plaintiff does not belong to any community, church, sports, or social groups and has few friends, due in part to his various mood swings and the fact that he gets easily agitated or frustrated when dealing with people. [AR at 143.] There were times, the Bieweners noted, when they "hardly recognized [plaintiff] as the son [they] knew," such as  when plaintiff became so aggressive and destructive that the Bieweners had to get help to control him.

1  [AR at 144.] The Bieweners also indicated that plaintiff does not always remember these episodes

2  and that his mind tends to wander, making  the recollection of past history and dates difficult for

3  him. [AR at 144.]

4       A vocational expert, Jeanine Matildi, also testified at the hearing. Based on the hypothetical

5  posed by the ALJ[5], the expert stated that plaintiff could perform a significant number of jobs in the

6  national economy. [AR at 389-90.]

7       From August 13, 1998, until October 18, 2002, plaintiff received treatment at the County

8  of San Bernardino Department of Behavioral Health. [AR at 481-508.] During that time, plaintiff

9  saw, among others, Dr. Timothy E. Hougen, Ph.D. [AR at 246-52, 505-08.] On August 13, 1998,

10  Dr. Hougen conducted a clinical assessment of plaintiff, noting that plaintiff appeared tired and

11  unkempt, but generally clean. [AR at 505-08.] Dr. Hougen also noted that plaintiff did not at that

12  time suffer from any substance abuse and that while plaintiff's speech was within normal limits with

13  respect to volume and tone, it was slow in rate. [AR at 506-07.] In light of plaintiff's legal difficulties,

14  declining mental health, and severe interpersonal difficulties, Dr. Hougen indicated that plaintiff

15  had limited judgment and appeared to have "idiosyncratic notions . . . in regards to violence" and

16  "poor modulation of anger." [AR at 507-08.] Dr. Hougen rated plaintiff's dysfunction to be "severe"

17  and concluded that his depression was exacerbated by limited social support, interpersonal

18  problems, and difficulties with the transition to his role as a father. [AR at 508.] Additionally, Dr.

19  Hougen assigned plaintiff a Global Assessment of Functioning[6] score of 32, stating that it could

20

21      5  The ALJ posed the following hypothetical at the hearing: "a 47 year old individual with a

22  high school education and work experience as outlined by [the vocational expert] and testimony
   today. This individual can perform simple repetitive tasks in jobs that require no hypervigilance.

23  He should not be in charge of safety operations of others. He should have no contact with the
   public. No intense interpersonal interactions. No high production quota or rapid assembly line

24  work. A moderate pace is okay." [AR at 389.]

25      6  A Global Assessment of Functioning score is the clinician's judgment of the individual's

26  overall level of functioning.  It is rated with respect only to psychological, social, and occupational
   functioning, without regard to impairments in functioning due to physical or environmental

27  limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental
   Disorders, 32 (4th Ed. 1996) (hereinafter, "DSM IV"). A GAF score of 31-40 reveals that plaintiff

28  has "[s]ome impairment in reality testing or communication . . . or major impairment in several

1  have been as high as 40 the year before.  This assessment was confirmed by E. Aziz, M.D.  [AR
2  at 252.]

3

4  **B.  FAILURE TO CONSIDER LAY TESTIMONY**

5          Plaintiff first contends that the ALJ did not appropriately consider the testimony of plaintiff's
6  mother and father, Celia Ann Biewener and Ron Biewener. Specifically, plaintiff asserts that the
7  ALJ erred by failing to comply with the District Court Order that required her to properly consider
8  the lay witness testimony and statements included in the record. See Joint Stipulation, 3.

9          Judges may, "in addition to evidence from the acceptable medical sources . . . , also use
10  evidence from other sources to show the severity of [plaintiff's] impairment(s) and how it affects
11  [his] ability to work." 20 C.F.R. §§ 404.1513(d), 416.1913(d) (2005). Such other sources include
12  spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy.
13  20 C.F.R. §§ 404.1513(d)(4), 416.1913(d)(4). Thus, lay witness testimony by friends and family
14  members who have the opportunity to observe plaintiff on a daily basis "constitutes qualified
15  evidence" that the ALJ must consider. Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987);
16  see Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993) ("[a]n eyewitness can often tell whether
17  someone is suffering or merely malingering. . . . [T]his is particularly true of witnesses who view
18  the claimant on a daily basis . . ."). To reject lay testimony, an ALJ must give reasons "germane
19  to each witness" for doing so. Dodrill, 12 F.3d at 919.

20          On June 5, 2003, the parties stipulated to remand the May 31, 2002, action to the
21  Commissioner for further administrative proceedings, including a new hearing and decision. [AR
22  at 532-34.] As noted in the Order, one of the reasons for remand was that "the ALJ did not
23  appropriately consider or discuss the lay witness testimony of plaintiff's mother, or consider the
24  lay witness statements of plaintiff's father and mother." [AR at 533.] As such, the Court ordered
25  that upon remand the ALJ should afford "proper consideration of lay witness testimony and
26  statements included in the record." [Id.]

27  ─────────────────

28  areas, such as work or school, family relations, judgment, thinking, or mood."  See DSM-IV, at 34.

9

Plaintiff first asserts that the ALJ did not properly consider the testimony of plaintiff's mother. See Joint Stipulation, 3-4. As defendant points out, however, the ALJ not only discussed Ms. Biewener's testimony, but also provided specific and legitimate reasons for rejecting it. See Joint Stipulation, 5-9; [AR at 299-300.] To support her decision to assign little weight to Ms. Biewener's testimony, the ALJ noted that the witness was not a medical professional, did not see her son on a daily basis and "actually had little interaction with him," and could not verify whether he took his medications as prescribed. [AR at 299-300.] The combination of reasons is germane to this witness and satisfies the standard set forth in Dodrill. As such, the ALJ appropriately considered Ms. Biewener's testimony pursuant to the District Court Order.

Although the ALJ discussed plaintiff's mother's testimony in her decision, she failed to mention the joint statements made in the third party questionnaire by plaintiff's mother and father, despite the Appeals Council's instructions to do so. [AR at 537.] Those statements commented on plaintiff's daily activities, social functioning, and cognitive abilities.[7] [AR at 140-45, 296-304.] Contrary to plaintiff's contention that such an omission warrants remand, however, the ALJ's failure in this instance constitutes harmless error because plaintiff's parents' written statement does not provide any additional information that would have affected the ALJ's determination that plaintiff can perform simple repetitive tasks. See Booz v. Sec'y of Health and Human Serv., 734 F.2d 1378, 1381 (9th Cir. 1984) (holding that the test for determining whether an error is harmless is "whether there is a reasonable possibility that [the new evidence] would have changed the outcome of the present case"). On the contrary, the questionnaire actually lends support to the ALJ's conclusion, as the parents noted that plaintiff can, depending on his mood, groom himself,

---

[7]   According to the Bieweners, a typical day for plaintiff entails sleeping late, keeping to himself, watching television, and being non-communicative. [AR at 140,145.] With respect to plaintiff's social functioning, the Bieweners noted that plaintiff, due to his various mood swings and the fact that he gets easily agitated with people, does not belong to any social groups and has few friends. [AR at 143.] The Bieweners also commented that plaintiff's mind tended to wander, which made it difficult for him to remember past history or dates. [AR at 144.] Finally, the Bieweners asserted that there were times when they "hardly recognized [plaintiff] as the son they knew," as he became so aggressive and destructive that they sometimes needed to get help to control him. [AR at 144.]

help with kitchen duties, make his bed, clean his room, and prepare food, tasks that are commensurate with basic work activities. [AR at 141-42.]

Further, although an ALJ has a duty to develop the record, she "does not need to meet the impossible burden of mentioning every piece of evidence" presented to her. Parks v. Sullivan, 766 F.Supp. 627, 635 (N.D. Ill. 1991). Rather, the ALJ must explain why "significant probative evidence has been rejected." Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984). Here, plaintiff has not indicated what evidence from the questionnaire is significant or probative or how the ALJ's consideration of it would change the outcome of the case. See Joint Stipulation, 9-10. When combined with the fact that the parents' interaction with plaintiff is, as stated supra, actually quite limited and the parents are unable to verify whether plaintiff takes his medication, which has been shown to help alleviate his symptoms,[8] the ALJ's failure to discuss the statements made in the questionnaire does not warrant remand.

**C.   FAILURE TO COMPLY WITH THE APPEALS COUNCIL ORDER TO GIVE PROPER WEIGHT TO THE OPINIONS OF TREATING PHYSICIANS**

Plaintiff also contends that the ALJ did not give proper weight to the opinion of plaintiff's treating physicians, including Dr. Hougen. Specifically, plaintiff asserts that the ALJ erred by failing to comply with the Order of the Appeals Council that required the ALJ to ensure that "[m]edical opinions and medical source statements from treating sources . . . are fully evaluated, weighed and if appropriate, accepted or rejected." [AR at 537]; see Joint Stipulation, 3.

According to 20 C.F.R. § 416.1477(b), "[t]he administrative law judge shall take any action that is ordered by the Appeals Council . . .".  See also Ruiz v. Apfel, 24 F.Supp.2d 1045, 1050 (C.D. Cal. 1998) (holding that "the ALJ is bound to follow the Appeals Council's order"). As stated supra, the Appeals Council gave the ALJ explicit instructions with respect to her evaluation of plaintiff's medical evidence. [AR at 537.] The ALJ's evaluation of Dr. Hougen's opinion falls short

---

[8]   In the questionnaire, plaintiff's parents noted that "before a balanced medication, [plaintiff] would stay in the bedroom most of the time." Once plaintiff started taking medication, however, he would come out of his room and watch television. [AR at 140.]

of those directives.  Dr. Hougen concluded, among other things, that plaintiff had limited judgment and poor modulation of anger.  He rated his dysfunction as "severe," and assigned him a GAF score of 32, indicating impairment in reality testing or a major impairment in several areas.  In her written decision, the ALJ stated that Dr. Hougen had provided plaintiff with refills of anti-depressants beginning in December 2002 and that, after plaintiff had missed two appointments, had faxed a copy of his records to a facility in Phoenix. [AR at 298-99.] There was no consideration of Dr. Hougen's finding of dysfunction, or even a passing reference to the very low GAF score.  Rather than fully evaluate Dr. Hougen's assessment of plaintiff's abilities, the ALJ gave it only a cursory glance, neglecting to assign any weight to it at all, or give any valid reasons to reject it. [Id.] As such, the ALJ did not comply with the Order of the Appeals Council.

Even if the ALJ had not been ordered by the Appeals Council to fully evaluate and weigh the opinions of plaintiff's treating physicians, the ALJ should still have done so, as treating physicians "are employed to cure and ha[ve] a greater opportunity to know and observe the patient as an individual." Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987).  Although "the administrative law judge is not bound by the . . . opinions of the claimant's physicians on the ultimate issue of disability . . . he cannot reject them without presenting clear and convincing reasons for doing so." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). Even if the treating physician's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific, legitimate reasons, supported by substantial evidence in the record. Lester, 81 F.3d at 828 n.5.

Although the ALJ did specifically reference Dr. Hougen in her written decision, she merely stated that plaintiff had received treatment from him in the past, but did not discuss any particulars of Dr. Hougen's assessment, let alone accept or reject it. [AR at 298-99.] Moreover, the ALJ's discussion of Dr. Hougen was inaccurate: while the ALJ indicated that Dr. Hougen had provided refills of medication to plaintiff, defendant has since pointed out that Dr. Hougen is not permitted to prescribe medication.  See Joint Stipulation, 11; [AR at 298.]

The ALJ's failure to provide specific, legitimate reasons in her written decision to reject Dr. Hougen's opinion, as affirmed by Dr. Aziz, is not harmless error because Dr. Hougen provided

1   information about plaintiff that could affect plaintiff's ability to perform substantial gainful activity

2   in the national economy.[9]   Defendant's argument that the ALJ sufficiently complied with the Order

3   of the Appeals Council by incorporating by reference the summary of medical evidence contained

4   in the prior ALJ decisions of May 31, 2002, and September 22, 2003, falls short, as these opinions

5   do not specifically refer to Dr. Hougen or his findings. See Joint Stipulation, 11; [AR at 13-18, 297,

6   315-24.][10]   In addition, although defendant correctly notes that Dr. Hougen's opinion is

7   contradicted by other physicians, the ALJ may not reject Dr. Hougen's opinion without providing

8   specific reasons for doing so. See Lester, 81 F.3d at 828 n.5; Joint Stipulation, 11-14.  Thus, in

9   light of the ALJ's failure to comply with the Order of the Appeals Council to fully evaluate and

10  weigh the "medical opinions and medical source statements from treating sources," and the

11  importance assigned to treating physicians' opinions, remand is warranted on this issue. [AR at

12  537.]

13  /

14  /

15  /

16  /

17  ———————————————

18  [9]   Upon finding plaintiff to have severe interpersonal difficulties and a poor modulation of his anger, Dr. Hougen concluded that plaintiff's dysfunction was severe. [AR at 248-49.] Dr. Hougen

19  also assigned plaintiff a GAF score of 32, stating that it may have reached 40 the year before. [AR at 252.] These scores, while not determinative of plaintiff's ability to perform substantial gainful

20  work, are an "aggregated measure of a patient's limitations" and represent a "doctor's overall estimation" of a patient's capacity.  Book v. Massanari, 2001 WL 902572, *5 (N.D. Cal. 2001).

21  Although a GAF score may not have a "direct correlation" to the Social Security severity requirements (see Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain

22  Injury, 65 F.R. § 50746-01 (Aug. 21, 2000)), the Court is aware of no authority asserting that the GAF score and its implications may be ignored and rejected without comment, as was done here.

23  Even if plaintiff's score is not directly translatable into Social Security terminology, the score, and plaintiff's dysfunction rating of severe, are still probative of plaintiff's condition. See, e.g., Escardille

24  v. Barnhart, 2003 WL 21499999, *6 (E.D. Pa. June 24, 2003) (remanding based in part on ALJ's

25  failure to address a GAF score of 50 "or its meaning regarding plaintiff's ability to maintain

26  employment.").  This evidence must be considered and addressed on remand.

27  [10]   Although the ALJ in the September 22, 2003, opinion refers to Exhibit 2F [AR at 316], which includes Dr. Hougen's opinion, the ALJ does not mention the finding of a severe dysfunction or

28  the low GAF score.

1

**VI.**

2

**REMAND FOR FURTHER PROCEEDINGS**

3      As a general rule, remand is warranted where additional administrative proceedings could

4  remedy defects in the Commissioner's decision.  <u>See</u> <u>Harman v. Apfel</u>, 211 F. 3d 1172, 1179 (9th

5  Cir.), <u>cert.</u> <u>denied</u>, 531 U.S. 1038 (2000); <u>Kail v. Heckler</u>, 722 F.2d 1496, 1497 (9th Cir. 1984).

6  In this case, remand is warranted to comply with the Order of the Appeals Council to fully evaluate

7  the opinions of plaintiff's treating physicians, including Dr. Hougen.

8      Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is

9  **GRANTED**; (2) the decision of the Commissioner is **REVERSED**; and (3) this action is

10  **REMANDED** to defendant for further proceedings consistent with this Memorandum Opinion

11      **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the

12  Judgment herein on all parties or their counsel.

13

14  DATED:   August 15, 2005                              /s/

15                                          PAUL L. ABRAMS
                                     UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28